IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MINNIE MASSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:09-CV-772-WKW [WO] |
| | ) | |
| EDNA SHELL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This case arises from an unfortunate disagreement between a then eighty-nine year-old mother and her attorney-in-fact daughter about how to handle the mother's living situation and her personal and real property. Plaintiff Minnie Massey ("Ms. Massey") claims that her daughter, Edna Shell ("Mrs. Shell"), and her son-in-law, Eugene Shell ("Mr. Shell"), improperly disposed of her personal property and improperly sold her real property to the City of Millbrook ("the City") and Mayor Al Kelley ("the Mayor"), through the services of Lucretia Cauthen Realty ("LCR"), its real estate agent Lucretia Cauthen ("Ms. Cauthen"), and its qualifying broker, Warren Cauthen ("Mr. Cauthen"). Ms. Massey brings a 42 U.S.C. § 1983 claim against the City, the Mayor, the Shells, and the Cauthens (Count IV), and state law claims against all Defendants, including an action to quiet title (Count I), an action in ejectment (Count II), a constructive trust (Count III), intentional infliction of emotional distress (Count V), conversion (Count VI), and improper supervision and training of Ms. Cauthen by Mr. Cauthen (Count VII).

Before the court are Mrs. Shell's motion for summary judgment (Doc. # 44), Mr. Shell's motion for summary judgment (Doc. # 45), a motion for summary judgment filed jointly by the City and the Mayor (Docs. # 39-40), and a motion for summary judgment filed jointly by LCR, Ms. Cauthen, and Mr. Cauthen (Docs. # 41-43).  Ms. Massey did not file a response in opposition.[1]  After careful consideration of the arguments of counsel, the applicable law and the record as a whole, the court finds that the motions are due to be granted.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1332(a) (diversity jurisdiction).  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation and internal quotation marks omitted); *see* Fed. R. Civ. P. 56(c)

---

[1] The October 19, 2010 Order (Doc. # 63) details the circumstances surrounding Ms. Massey's failure to respond to Defendants' motions for summary judgment in accordance with the General Briefing Order (Doc. # 23).

(Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. Fed. R. Civ. P. 56(e)(2); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (citation and internal quotation marks omitted).

3

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 242 (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment.").

Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

4

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex Corp.*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV. FACTS[2]

Ms. Massey is now ninety-one years old, and has two children, Edna Alberson Shell and David Alberson. (Massey Dep. 7, 169.) Prior to the events in question, Ms. Massey lived in and owned a nearly eighty-year-old home in Millbrook, Alabama, and also owned several adjoining homes that she used as rental properties. (Mrs. Shell Aff. 4.) The houses were dilapidated, which required Mr. and Mrs. Shell to contribute their own money to provide for the upkeep of both Ms. Massey's personal home and her rental properties. (Mrs. Shell Aff. 4.) Mrs. Shell has cared for her mother since at least the early 1990s, to include paying some of her bills, running errands for her, and assisting with the upkeep of her real property and homes. (Mrs. Shell Aff. 1-2.)

---

[2] The facts are drawn in the light most favorable to Ms. Massey, even though only Defendants have provided evidence. The actual facts may be different than those stated here. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]acts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case. Nevertheless, for summary judgment purposes, [the] analysis must begin with a description of the facts in the light most favorable to the plaintiff.") (citation and internal quotation marks omitted).

In 1998, Ms. Massey executed a power of attorney ("POA"), appointing Mrs. Shell as her attorney-in-fact.  (Mrs. Shell Aff. 3; Doc. # 44, Ex. 5 ("POA").)  The POA included a provision granting Mrs. Shell the power "to sell, either at public or private sale, or exchange any part or parts of [Ms. Massey's] real estate or personal property for such consideration and upon such terms as [her] attorney shall think fit."  (POA ¶ 8.)   It also included a provision granting Mrs. Shell the power to deposit, withdraw, employ, pay, invest, receive and give receipts for Ms. Massey's money as Mrs. Shell thought fit.  (POA ¶ 9.)  The POA declared that any actions by the attorney-in-fact would be binding on Ms. Massey "unless and until reliable intelligence or notice [of Ms. Massey's death or other revocation of the POA] shall have been received by any person acting in reliance hereon."  (POA ¶ 17.)  Further, it was a durable power of attorney, providing that the POA "would not be affected by [Ms. Massey's] subsequent disability, incompetency, or incapacity."   (POA ¶ 17.)  Finally, the POA included a catch-all provision granting Ms. Massey's attorney-in-fact the power, "[i]n general to do all other acts, deeds, matters, and things whatsoever in or about [Ms. Massey's] estate, property, and affairs . . . as fully and effectually to all intents and purposes as [Ms. Massey] could do in [her] own proper person if personally present."  (POA ¶ 14.)

Based on the conditions of Ms. Massey's home and properties, Ms. Massey's physical limitations, and her inability to keep up with her properties and financial affairs, Mrs. Shell decided in early 2009 to move Ms. Massey into the Bell Oaks retirement community in Montgomery, Alabama.  (Mrs. Shell Aff. 3, 5.)  In fact, the Shells took Ms. Massey to Bell

Oaks, and she apparently liked it.  (Mrs. Shell Aff. 3.)  On February 28, 2009, however, Mrs. Shell informed Ms. Massey of her plan to move her to Bell Oaks, and Ms. Massey replied with cursing and threats involving a pistol.  (Mrs. Shell Aff. 5; Mr. Shell Aff. 2.)  Ms. Massey also told the Shells that she would drive to Atlanta to stay at her brother's house rather than go to Bell Oaks.  (Mrs. Shell Aff. 5.)  Mrs. Shell then decided to take Ms. Massey's car based on her concerns about Ms. Massey driving alone, her safety, and the safety of other drivers.  (Mrs. Shell Aff. 5.)  In fact, Ms. Massey had previously gotten a speeding ticket for driving 75 miles per hour in a 25-mile-per-hour zone.  (Mrs. Shell Aff. 3.)  The car was titled in both Ms. Massey and Mrs. Shell's names.  (Doc. # 44, Ex. 7.)

The following day, Mr. and Mrs. Shell, along with an unidentified Millbrook police officer, returned to Ms. Massey's house to retrieve her car.  (Mrs. Shell Aff. 5.)  Mrs. Shell asked the police officer to accompany her for protection due to her mother's threats the day before.  (Mrs. Shell Aff. 5.)  Before taking Ms. Massey's car, either Mr. or Mrs. Shell removed her suitcase from the trunk of the car and placed it on Ms. Massey's bed.  (Mrs. Shell Aff. 5; Mr. Shell Aff. 2.)  Though it was unknown to Mr. and Mrs. Shell at the time, Ms. Massey's pistol was in the suitcase.[3]  (Mrs. Shell Aff. 5.)  Mr. Shell then drove the vehicle to Bell Oaks and left it there.  (Mr. Shell Aff. 2-3.)  Subsequently, Mrs. Shell sold the car to a third-party and gave the proceeds from the sale to Ms. Massey's attorney.  (Mrs. Shell Aff. 8.)

---

[3] David Alberson, Ms. Massey's grandson, later took the pistol from Ms. Massey's suitcase at Bell Oaks.  (Mr. Shell Aff. 3.)

On March 4, 2009, Ms. Massey's brother picked her up and took her to Atlanta, Georgia.  (Mrs. Shell Aff. 5.)   While Ms. Massey was in Georgia, Mrs. Shell, with Mr. Shell's help, moved Ms. Massey's personal belongings to her new apartment at Bell Oaks. (Mrs. Shell Aff. 6.)  At some point, her furniture and personal belongings were also moved into a storage unit in Montgomery, Alabama.  (Massey Dep. 114-15.)   Ms. Massey herself admitted, however, that she does not know of any of her belongings that are missing from her storage unit.  (Massey Dep. 114-15.)

After Ms. Massey left for Atlanta on March 4, 2009, Mrs. Shell initiated the sale of Ms. Massey's home.  (Mrs. Shell Aff. 6.)  Mrs. Shell had previously listed the adjacent rental properties with Ms. Cauthen of LCR.  (Mrs. Shell Aff. 6.)  After Ms. Massey left for Atlanta, Mrs. Shell contacted Ms. Cauthen about also selling Ms. Massey's home, pursuant to her POA.  (Mrs. Shell Aff. 6.)  Sometime between March 4, and March 9, 2009, Ms. Cauthen approached the Mayor offering to sell Ms. Massey's property to the City for $30,000. (Kelley Aff. 1.)  Ms. Cauthen informed the Mayor that Mrs. Shell had a POA for Ms. Massey, and that Mrs. Shell was moving Ms. Massey into an elderly care facility.  (Kelley Aff. 1.)  The Mayor subsequently visited the property, spoke briefly with Mrs. Shell, and determined that the property would be of value to the City for future use.  (Kelley Aff. 2.) The Mayor then called Ms. Cauthen back and told her that the City would be interested in buying the property.  (Kelley Aff. 2.) Ms. Cauthen told the Mayor that the price was actually $38,000 because the family needed more money from the transaction.  (Kelley Aff. 2.) Throughout these negotiations, Ms. Cauthen was acting as the seller's agent, and she was

negotiating on behalf of Mrs. Shell.  (Kelley Aff. 2.)  On March 9, 2009, the Millbrook City Council approved the purchase of the property for $38,000.  (Kelley Aff. 2.)

On March 23, 2009, Mrs. Shell, Ms. Cauthen, and the Mayor closed on the sale of the property from Ms. Massey to the City.  (Kelley Aff. 3; Cauthen Aff. 4-5.)  At the closing, Mrs. Shell executed the closing documents on behalf of Ms. Massey and presented the POA to the other parties.  (Cauthen Aff. 4; Kelley Aff. 3.)  All the closing participants believed Mrs. Shell had a valid POA, and had no notice that Ms. Massey had revoked Mrs. Shell's POA.  (Mrs. Shell Aff. 7-8; Cauthen Aff. 5; Kelley Aff. 3.)  After the closing, Mrs. Shell deposited the proceeds from the sale of Ms. Massey's real property into Ms. Massey's Regions Bank checking account.  (Mrs. Shell Aff. 8.)  Mrs. Shell did not receive anything from the sale.  (Mrs. Shell Aff. 8.)  Ms. Cauthen received an $8,000 brokerage fee from the proceeds of the sale for her work as the seller's agent and for other work she had performed getting the real property ready for sale over the previous eight months.  (Cauthen Aff. 5.)

On March 8, 2009, prior to the agreement to sell the house, the Shells met with Ms. Massey's grandson, David Alberson (the "Grandson").  (Mrs. Shell Aff. 6.)  The Shells told the Grandson that they were going to move Ms. Massey into Bell Oaks, and about "what [they] were doing."  (Mrs. Shell Aff. 6.)  The Shells also showed the Grandson the apartment at Bell Oaks.  (Mrs. Shell Aff. 6.)  The Grandson agreed with the Shells' plans, returned to Georgia to pick up Ms. Massey, and on that same day, brought her to Bell Oaks and helped her move into her apartment.  (Mrs. Shell Aff. 6-7.)  Before the Grandson returned to Georgia, Mrs. Shell explained to Ms. Massey and him that Bell Oaks would allow her to keep

9

her dog there, but doing so required a $250 fee and the dog to be current on its shots.  (Mrs. Shell Aff. 6-7.)   Mrs. Shell also explained that she had taken the dog to a veterinarian for proof of shots, but had discovered that the dog was two years behind on its shots.  (Mrs. Shell Aff. 6.)  Due to the costs involved in vaccinating the dog and because neither Ms. Massey nor the Grandson volunteered to pay the costs, Mrs. Shell took the dog to an animal shelter.  (Mrs. Shell Aff. 6-7.)  Mrs. Shell then told Ms. Massey the dog had died, rather than telling her that she had taken it to an animal shelter.  (Mrs. Shell Aff. 7.)  The Grandson left to return to Atlanta on March 9, 2009.  (Mrs. Shell Aff. 7.)  After about a month of living at Bell Oaks, Ms. Massey became dissatisfied and returned to live with her brother in Georgia.  (Mrs. Shell Aff. 7.)

On March 30, 2009, Mrs. Shell received, by registered letter at the post office, a new POA for Ms. Massey, naming Linda Oboshoma, Ms. Massey's niece, as her new attorney-in-fact, and revoking Mrs. Shell's POA.  (Mrs. Shell Aff. 8.)  This was the first notice Mrs. Shell received that her previous POA had been revoked.  (Mrs. Shell Aff. 8.)  After receiving the new POA, Mrs. Shell closed Ms. Massey's Regions Bank checking account.  (Mrs. Shell Aff. 8.)  She then took those funds, including all of Ms. Massey's funds collected by Mrs. Shell, to the office of Mr. Keith Howard, who in turn deposited the funds with a probate judge in Elmore County.  (Mrs. Shell Aff. 8.)  In June 2009, Ms. Massey's counsel, Winn Faulk, was named her new attorney-in-fact, and the funds were turned over to him.  (Mrs. Shell Aff. 8.)  Mrs. Shell likewise turned the proceeds from the sale of the car over to Mr.

Faulk, even though the vehicle was titled in both Ms. Massey's and her name.  (Mrs. Shell Aff. 8.)

Ms. Massey's action is comprised of the following claims: (1) an action to quiet the City's title in her former real property in Millbrook (Count I); (2) an action to eject the City from her former real property in Millbrook (Count II); (3) an action to impose a constructive trust on her former real property, all proceeds derived from the real property, and on the brokerage fee earned by the Cauthens and LCR for the sale of the real property (Count III); (4) a 42 U.S.C. § 1983 claim against the City, the Mayor, and an unknown police officer for their actions "in effecting what was tantamount to an act of eminent domain or condemnation without due process of law and without paying just compensation to [Ms. Massey]" (Am. Compl. ¶ 32), and for their "abdication of [their state] authority" to the Shells and Cauthens, and against the Shells and Cauthens for usurping the state actors' authority in such a way that their conduct became official conduct of the City under the color of state law (Count IV) (Am. Compl. ¶ 32); (5) an intentional infliction of emotional distress claim against Mr. and Mrs. Shell (Count V); (6) a conversion claim against Mr. and Mrs. Shell for taking her car, her pistol, her dog, and her personal belongings, and against the Cauthens, LCR, and the Shells for conversion of the funds used to pay Ms. Cauthen's brokerage fee and the closing costs of her real property (Count VI); and (7) a claim that Mr. Cauthen, as Ms. Cauthen's "Qualifying Broker," negligently and wantonly failed to properly train and supervise Ms. Cauthen (Count VII).  Ms. Massey seeks equitable relief, compensatory damages, and punitive damages.  She also demands a jury trial.

11

## V.  DISCUSSION

After a thorough review of the evidence and Defendants' motions, the court finds that Defendants' motions are due to be granted on all claims.[4]

**A.**   **Ms. Massey's Actions to Quiet Title, to Eject the City From Her Former Real Property, and to Impose a Constructive Trust Fail (Counts I-III).**

Ms. Massey's claims in Count I-III all rest on the same issue:  whether Mrs. Shell's sale of Ms. Massey's real property to the City pursuant to the POA was valid under Alabama law.  For the following reasons, Ms. Massey has failed to raise a genuine issue of material fact that the sale of her real property was unenforceable.

"A power of attorney is defined as '[a]n instrument in writing whereby one person, as principal, appoints another as his agent and confers authority to perform certain specified acts or kinds of acts on behalf of [the] principal. . . .  The agent is [the] attorney in fact [of the principal]. . . .'"  *Sevigny v. New South Fed. Sav. & Loan Ass'n*, 586 So. 2d 884, 886 (Ala. 1991) (quoting Black's Law Dictionary 1171 (6th ed. 1990)).  "When one accepts the agency, she implicitly covenants to use the powers conferred upon her for the sole benefit of the party conferring such power, consistent with the purposes of the agency relationship."

---

[4] "[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion."  *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  The court, however, "need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials."  *Id.*  Finally, "the district court's order granting summary judgment must 'indicate that the merits of the motion were addressed.'"  *Id.* at 1102 (citing *Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir. 1988)).

*Id.* (citing *Dudley v. Colonial Lumber Co.*, 137 So. 429 (Ala. 1931)).  "Therefore, when one accepts the power of attorney, she impliedly covenants to use the powers bestowed upon her for the sole benefit of the one conferring that power on her, consistent with the purposes of the agency relationship represented by the power of attorney."  *Id.*  "The principal-agency relationship is fiduciary in nature and imposes upon the agent a duty of loyalty, good faith, and fair dealing."  *Id.*  "Powers of attorney will be strictly construed, restricting the powers to those expressly granted and those incidental powers that are necessary to effectuate the expressed powers."  *Id.* at 886-87 (citing *Hall v. Cosby*, 258 So. 2d 897 (Ala. 1972)).  In *Lamb v. Scott*, 643 So. 2d 972 (Ala. 1984), the Alabama Supreme Court held that for an attorney-in-fact to act against the intent of the principal, the attorney-in-fact had to have express authority to do so.  *Id.* at 974.  The Alabama Supreme Court later distinguished *Lamb*, explaining that "[t]he situation presented by *Lamb* involved self-dealing. . . . [However,] [w]e decline to impose the requirement of specificity even in instances where there has been no self-dealing."  *Miller v. Jackson Hosp. & Clinic*, 776 So. 2d 122, 124 (Ala. 2000).  Thus, the guidelines for judging an attorney-in-fact's actions remain whether he or she has acted for the sole benefit of the principal and consistent with the agency duties of loyalty, good faith, and fair dealing, regardless of the principal's intent. *Id.* (internal citations omitted).

Under Alabama Code § 26-1-2(e), an agent's affidavit attesting to her lack of knowledge of the revocation of the power of attorney by the principal at the time of her

action pursuant to the power of attorney is conclusive proof that the power of attorney was

not revoked.  The statute reads in pertinent part:

> As to acts undertaken in good faith reliance thereon, an affidavit executed by the attorney in fact under a power of attorney, durable or otherwise, stating that he or she did not have, at the time of the exercise of the power, actual knowledge of the termination of the power by revocation or of the death, disability, incompetency, or incapacity of the principal is conclusive proof of the nonrevocation or nontermination of the power at that time.

Ala. Code § 26-1-2(e) (1975).

Mrs. Shell was authorized by the POA to sell Ms. Massey's real property and she did

so in an arms-length transaction with the City; thus, the title to the property properly belongs

to the City.  First, there is no evidence that Mrs. Shell was engaged in self-dealing when she

sold Ms. Massey's property to the City.  All of the proceeds from the sale were deposited in

Ms. Massey's bank account; Mrs. Shell received no benefit from such sale; and all the

proceeds from the sale, save the brokerage fee paid to Ms. Cauthen, were promptly turned

over to Ms. Massey upon the termination of Mrs. Shell's POA.  Second, the POA expressly

gave Mrs. Shell the power to sell Ms. Massey's property.  (POA ("I , Minnie J. Massey . . .

hereby appoint Edna Shell . . . as my true and lawful attorney to act in, manage, and conduct

all my affairs. . . . to do and execute all or any of the following acts . . . [t]o sell, either at

public or private sale, . . . any part or parts of my real estate or personal property for such

consideration and upon such terms as my attorney shall think fit, and to execute and deliver

good and sufficient deeds or other instruments for the conveyance or transfer of the

same. . . .").)

Third, there is no evidence that Ms. Massey revoked Mrs. Shell's POA prior to the real property closing or that Mrs. Shell had any knowledge of such revocation by Ms. Massey.  In fact, Mrs. Shell's affidavit is conclusive proof of nonrevocation of the POA. Fourth, there is no evidence showing that Mrs. Shell acted contrary to her fiduciary duties under the POA.  Rather, the evidence shows that she acted in the best interests of her aged mother, who had been living with considerable physical and financial difficulty in an old, deteriorating residence.  Fifth and finally, there is simply no evidence of any other defect in the arms-length sale of Ms. Massey's real property by Mrs. Shell to the City.  Thus, Ms. Massey's actions to quiet title, to eject the City, and to impose a constructive trust fail.[5]

**B.**     **Ms. Massey's § 1983 Claim Fails (Count IV).**

Ms. Massey's § 1983 claims are based on the City and Mayor's alleged misuse of their state authority in violation of the Fifth and Fourteenth Amendments.  Further, Ms. Massey claims that the Shells and Cauthens usurped the City's state authority through the sale of her real property, and that the Shells usurped state authority in seizing her car.

In order for a plaintiff to prevail on a § 1983 claim, he or she must show a constitutional violation.  *Rymer v. Douglas Cnty.*, 764 F.2d 796, 800 (11th Cir. 1985).  "The just compensation clause of the Fifth Amendment prohibits private property from being taken for public use without just compensation."  *Id.*  "[W]hen a government entity exercises its

---

[5] Ms. Massey's action to impose a constructive trust on the brokerage fee paid to Ms. Cauthen also fails because the underlying transaction was valid.

power of eminent domain to obtain title to the property through formal condemnation proceedings[,] there has been a taking." *Id.*

Ms. Massey has produced no evidence that the City obtained her home through the exercise of its power of eminent domain. Rather, the evidence readily shows that Mrs. Shell, through her agent Ms. Cauthen, approached the City about selling the real property, and the City purchased the real property through a negotiated, arms-length transaction with Ms. Massey's attorney-in-fact. The City and the Mayor committed no constitutional violation when the City purchased Ms. Massey's home from Mrs. Shell.

Further, Ms. Massey contends that she was deprived of her property without due process of law in violation of the Fourteenth Amendment. "In this circuit, a § 1983 claim alleging a denial of due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process.*" Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). "[A] procedural due process violation is not complete unless and until the State fails to provide due process." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (citation and internal quotation marks omitted). "In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under § 1983 arise." *Id.* Ms. Massey's procedural due process claim fails for two reasons: (1) there is no evidence of a constitutional deprivation of her property rights by state action because she received consideration from the City for the sale of her property in an arms-

16

length transaction negotiated by her attorney-in-fact; and (2) Alabama law provides an adequate means of post-deprivation redress for any allegedly impermissible property deprivation. *See, e.g., McEachin v. City of Tuscaloosa*, 51 So. 153, 154 (Ala. 1909) (recognizing a right of action to sue a municipal corporation for a taking of property under the Alabama Constitution).

Ms. Massey's claim that the Shells and the Cauthens have usurped the City's governmental power also fails. "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). "The Eleventh Circuit recognizes three tests for establishing state action by what is otherwise a private person or entity: the public function test, the state compulsion test, and the nexus/joint action test." *N.B.C. v. Commc'n Workers of Am., AFL-CIO*, 860 F.2d 1022, 1026 (11th Cir. 1988). "The public function test for state action has been limited strictly, and covers only private actors performing functions traditionally the exclusive prerogative of the State." *Id.* (internal quotation marks and citations omitted). The state compulsion test "limits state action to instances in which the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." *Id.* (internal citations omitted). Finally, to charge a private party with state action under the nexus/joint action test, "the governmental body and private party must be intertwined in a symbiotic relationship." *Id.* (internal quotation marks and citations omitted). The evidence makes it clear that the actions of the Shells and Cauthens do not meet any of the aforementioned tests for state action. Further, the evidence shows that it was Ms. Cauthen, acting on behalf of Mrs. Shell, who first

approached the Mayor about purchasing Ms. Massey's real property, and that there was no state encouragement involved in the sale.  Because Mrs. Shell and her agent Ms. Cauthen negotiated as private parties with the City and the Mayor in reaching the agreement to sell Ms. Massey's property, Ms. Massey's § 1983 Fourteenth Amendment due process claim against them also fails.

Finally, Ms. Massey's § 1983 claim against the unknown police officer who assisted Mrs. Shell in retrieving Ms. Massey's car also fails.  It is presumed that by making a claim against an unknown, non-defendant police officer, Ms. Massey seeks to impose municipal liability against the City for his alleged actions.  "If a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 123 (1992).  "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that [her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).  Further, "analysis of a [governmental entity's] custom or policy is unnecessary . . . when no constitutional violation has occurred." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1170 (11th Cir. 2009); *see also Barnwell v. Douglas Cnty., Ga.*, 390 F. App'x 862, 864 (11th Cir. 2010), *cert. denied*, 2011 WL 55437 (Jan. 10, 2011); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (Absent a constitutional

violation by a deputy, the Sheriff and the City could not be held liable under a theory of municipal liability.).

Ms. Massey has pointed to no custom or policy on the part of the City, as relates to the unknown officer, sufficient for municipal liability. Further, Mrs. Shell had an ownership interest in the vehicle as evidenced by her name on the title. Because Mrs. Shell had an ownership interest in the car and a valid POA allowing her to possess Ms. Massey's property, it follows that no constitutional violation occurred where the officer was present to prevent a breach of the peace. *See Cofield v. Randolph Cnty. Comm'n*, 90 F.3d 468, 471 (11th Cir. 1996) ("[W]e think it plain that an officer's mere presence during a lawful repossession is of no moment."). Defendants are due summary judgment on Ms. Massey's § 1983 claims.

## C.   Ms. Massey's Intentional Infliction of Emotional Distress Claim Fails (Count V).

Ms. Massey claims intentional infliction of emotional distress as to "the conduct" of Mr. and Mrs. Shell.[6] Mr. and Mrs. Shell move for summary judgment on the grounds that their conduct was not sufficiently outrageous or extreme for such a tort action.

Under Alabama law, to recover for the tort of outrage, or intentional infliction of emotional distress, the plaintiff must show by substantial evidence:

(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the actions of the defendant were the cause of

---

[6] The Amended Complaint does not specifically list the alleged conduct giving rise to Ms. Massey's claim of intentional infliction of emotional distress, but the court infers that the complained of conduct includes the Shells' sale of her home, the seizure and sale of her car, moving her into Bell Oaks, moving her furniture and personal belongings, and lying to her about the death of her dog when the dog had been delivered to the animal shelter.

the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*U.S.A. Oil, Inc. v. Smith*, 415 So. 2d 1098, 1100 (Ala. Civ. App. 1982) (internal quotation marks and citations omitted).  To meet the bar of extreme and outrageous conduct, the conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).  "[The tort of intentional infliction of emotional distress] has since been limited by caselaw to only a few factual situations." *Little v. Consolidate Pub. Co.*, No. 2090705, 2010 WL 4910858 *12 (Ala. Civ. App. 2010) (citing Michael L. Roberts & Gregory S. Cusimano, Alabama Tort Law § 23.0 [sic] (2d ed. 1996)).  The limited scenarios in which Alabama courts have found a jury question on an outrage claim are: "(1) cases having to do with wrongful conduct in the context of family burials; (2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce an insured into settling an insurance claim; and (3) a case involving egregious sexual harassment."   1 Michael L. Roberts & Gregory S. Cusimano, Alabama Tort Law § 23.02 (5th ed. 2010).

Based on the evidence before the court, Mr. and Mrs. Shell are entitled to summary judgment on Ms. Massey's claim of intentional infliction of emotional distress.  The Shells' conduct in selling Ms. Massey's house, seizing and selling the car, moving her into Bell Oaks, and moving her furniture are plainly not the kind of extreme and outrageous conduct giving rise to the tort of outrage.  Mrs. Shell's conduct in dropping Ms. Massey's dog off at

20

the animal shelter, but telling Ms. Massey that her dog had died, arguably presents a closer question.  Despite this closer question, the record is devoid of any evidence that Ms. Massey suffered severe emotional distress as a proximate result of Mrs. Shell's lie about the fate of her dog.  Further, the parties do not cite and the court did not find any Alabama caselaw holding that lying about a pet's death is sufficiently extreme and outrageous to present a jury question.[7]  Nor is this a case that fits into one of the three narrow factual categories where Alabama courts have allowed an intentional infliction of emotional distress claim to go to the jury.  Further, absent any citation to authority from Ms. Massey, the court declines, on these facts, to draw an analogy to those cases dealing with wrongful conduct in the context of family burials, *id.* at § 23.05, because pets are generally recognized as personal property and not family members.  *See, e.g., Placey v. Placey*, 51 So. 3d 374, 379 (Ala. Civ. App. 2010) (citing 3B C.J.S. Animals § 4 (2003)).  Thus, Mr. and Mrs. Shell are due summary judgment on Ms. Massey's intentional infliction of emotional distress claim.

**D.    Ms. Massey's Conversion Claims Fail (Count VI).**

Ms. Massey also alleges that Mr. and Mrs. Shell converted her personal property including her car, her pistol, her dog, and her furniture.  She further alleges that the Shells, the Cauthens, and LCR converted proceeds from the sale of her house.

---

[7] It appears that only a minority of states have allowed damages for intentional infliction of emotional distress for conduct causing the death of a pet, "if the conduct resulting in injury to or death of a pet is either intentional, willful, malicious, or reckless."  *Harabes v. Barkery, Inc.*, 791 A. 2d 1142, 1144 (N.J. Super. Ct. Law Div. 2001) (collecting cases from Florida, Kentucky, and Idaho).  The fate of the dog after it was dropped off at the animal shelter is unclear from the evidence.

"To establish conversion, a plaintiff must show a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Ex parte Coleman*, 861 So. 2d 1080, 1085 (Ala. 2003).   However, "the bare possession of property without some wrongful act in the acquisition of possession, or its detention, and without illegal assumption of ownership or illegal user or misuser, is not conversion." *White v. Drivas*, 954 So. 2d 1119, 1123 (Ala. Civ. App. 2006).  In addition, "where a taker acquires possession of the property rightfully and has neither asserted legal title to it nor exercised dominion over it inconsistent with the rights of the owner, a demand and refusal to deliver the property are necessary" to maintain an action for conversion.  *Driver v. Hice*, 618 So. 2d 129, 130 (Ala. Civ. App. 1993); *see also* 1 Michael L. Roberts & Gregory S. Cusimano, Alabama Tort Law § 29.05 (5th ed. 2010) ("If, however, the property has come into the possession of the defendant by the consent of the plaintiff, then a demand from the plaintiff and a refusal to return the property is required to sustain an action for conversion unless the plaintiff can show an illegal use or misuse."). Finally, "[i]t is well settled that money may be subject to a conversion claim, where there is an obligation to keep that money intact or to deliver it."  *Pike v. Reed*, 47 So. 3d 253, 258 (Ala. Civ. App. 2009).  "Generally, an action for conversion of money will not lie unless the money is specific and capable of identification."  *Id.* (internal citations omitted).

As to Mr. and Mrs. Shell, Ms. Massey's claims fail because there is no evidence from which a reasonable juror could find that either Defendant committed a wrongful taking or illegal use of her property, or that Ms. Massey made a demand for the return of her property

and they refused.  First, Mrs. Shell held a valid POA that gave her explicit permission and consent to "sell . . . or exchange any part or parts of [Ms. Massey's] . . . personal property . . . upon such terms as [her] attorney shall think fit."  (POA.)  Further, the POA included a catch-all provision granting her attorney-in-fact the power, "[i]n general to do all other acts, deeds, matters, and things whatsoever in or about [Ms. Massey's] estate, property, and affairs . . . as fully and effectually to all intents and purposes as [she] could do in [her] own proper person if personally present."  Mrs. Shell acted pursuant to the POA and the consent explicitly detailed therein when she seized Ms. Massey's car and delivered Ms. Massey's dog to the animal shelter.  Ms. Massey has provided no evidence that she demanded the return of the car or the dog, and that Mr. and Mrs. Shell subsequently refused to return either.  Mrs. Shell also produced evidence that she took both actions in the best interest of Ms. Massey.  As to the car, Mrs. Shell produced evidence that she delivered the proceeds from the sale of the car to Ms. Massey's attorney.  Further, Mrs. Shell was also listed as an owner of the vehicle.  As to the dog, Mrs. Shell produced evidence that she dropped the dog off at the animal shelter because of Ms. Massey's dire financial state and the costs of vaccinating the dog and keeping it at Bell Oaks.

As to the pistol, the evidence shows that it simply remained inside Ms. Massey's suitcase until it was taken by the Grandson.  Finally, as to the furniture and other personal belongings, Ms. Massey admits that both were moved on her behalf to Bell Oaks and to her storage unit, and that she is unaware of any property that is missing.  In addition, Mrs. Shell's POA further insulates her and Mr. Shell from any claim of conversion on this property.

Summary judgment is also due on Ms. Massey's claim concerning the proceeds from the sale of her real property that funded Ms. Cauthen's brokerage fee and the closing costs on the real property.  As discussed earlier, the POA gave Mrs. Shell the power to sell Ms. Massey's house, and there is no evidence that Mrs. Shell violated her fiduciary duties to Ms. Massey by selling the house.  Ms. Cauthen and LCR provided a necessary service for the sale of Ms. Massey's real property, one specifically requested by Mrs. Shell and paid for by Mrs. Shell pursuant to her powers under the POA.  Defendants are due summary judgment on all of Ms. Massey's conversion claims.

**E.**     **Ms. Massey's Negligent Training and Supervision Claim Against Mr. Cauthen Fails (Count VII).**

Finally, Ms. Massey alleges, "If [Ms.] Cauthen was acting under the impression that she could deal with one's attorney-in-fact in a manner contrary to the wishes of the attorney's principal, then such impression would necessarily have been proximately caused by Warren D. Cauthen['s] negligent and wanton failure to properly train and supervise his agents." (Am. Compl. 16.)

"A party alleging negligent supervision and hiring must prove the underlying wrongful conduct of the defendant's agent[]."  *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008).  Pursuant to Mrs. Shell's POA, Ms. Cauthen simply provided her services as the seller's agent for Mrs. Shell and Ms. Massey.  There is no evidence that she acted wrongfully in providing such services.  Thus, Ms. Massey's negligent supervision claim against Mr. Cauthen fails.

## VI.  CONCLUSION

Accordingly, it is ORDERED that Defendants' motions for summary judgment (Docs.

#  39, 41, 44, 45) are GRANTED.  A separate judgment will be issued.

DONE this 24th day of March, 2011.

_____/s/ W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE